IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMIE KAHRS,

          Plaintiff,

vs.                                                        No. CIV 00-1138 LH/LCS

LARRY G. MASSANARI,[1] ,
Acting Commissioner,
Social Security Administration,

          Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court upon Plaintiff's Motion to Reverse or Remand the Administrative Decision (*Doc. 9*), filed February 26, 2001.  The Commissioner of Social Security issued a final decision denying the Plaintiff her claim for a period of disability and disability insurance benefits.  The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well taken and recommends that it be DENIED.

## PROPOSED FINDINGS

## I. PROCEDURAL RECORD

1.      Plaintiff Jamie Kahrs filed an application for a period of disability insurance benefits and supplemental insurance benefits with the Social Security Administration on August 29, 1995

---

[1]      Effective March 29, 2001, Larry G. Massanari was appointed to serve as Acting Commissioner of Social Security. Pursuant to FED. R. CIV. P. 25 (d), Larry G. Massanari, Acting Commissioner of Social Security, is substituted for William A. Halter, Acting Commissioner of Social Security, as the defendant in this action.

alleging a disability since May 7, 1994 due to a head injury and a below the knee amputation caused by a motorcycle accident. *See* R. at 78. Plaintiff's application was denied at the initial level on October 17, 1995, *see* R. at 102, and at the reconsideration level on February 26, 1996. *See* R. at 111. Plaintiff appealed the denial of his claim by filing a Request for Hearing by Administrative Law Judge (ALJ) on April 12, 1996. *See* R. at 117.

2.    The Commissioner's ALJ conducted a hearing on Kahrs' application on July 9, 1997. *See* R. at 11. The ALJ made the following conclusions according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993): the claimant had not engaged in substantial gainful activity since February 1, 1995; claimant had a "severe" impairment or combination of impairments due to a below right knee amputation, status post left foot fracture, skull fracture, intracranial bleed and shoulder fracture; the severity of the claimant's impairments did meet the A-Criteria requirements for the listed impairment of organic mental disorder; the severity of the claimant's impairments did not meet the B-Criteria requirements for the listed impairment of organic mental disorder; the claimant's subjective allegations of pain are supported by "observable manifestations," but do not reduce his residual functional capacity below light work; and the claimant cannot perform his past relevant work because he cannot perform medium work. *See* R. at 11-26. Because of these findings, the ALJ interviewed a vocational expert and finally concluded that Mr. Kahrs was not disabled and that he had retained the residual functional capacity to perform at least light work. *See* R. at 26. Plaintiff objects to these findings, particularly, to the ALJ's analysis under the Listings and his assessment that he could perform at least light work.

3.    The ALJ entered his decision on November 27, 1997. *See* R. at 11-26. Thereafter, the

Plaintiff filed a request for review in January of 1998 to the Appeals Council. *See* R. at 7. On July 21, 2000, the Appeals Council issued its decision denying request for review and upholding the final decision of the ALJ. *See* R. at 5. The Plaintiff subsequently filed his complaint for court review of the ALJ's decision on August 4, 2000. (*Doc. 1*).

## II. STANDARD OF REVIEW

4.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation omitted)).  A decision of an ALJ is not supported by substantial evidence if other evidence on the record overwhelms the evidence supporting the decision.  *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

5.      In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Thompson*, 987 F.2d at 1486. The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. *See* 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *See Thompson*, 987 F.2d at 1487.

6.      At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *See id.*

### III. ADMINISTRATIVE RECORD

7.      The record indicates that in 1984, Mr. Kahrs was injured in a motorcycle accident. *See* R. at 265. As a result of that accident, the claimant's right leg below the knee was amputated. *Id.* He was subsequently involved in an accident on May 8, 1994 where he sustained injuries to his shoulder, foot, back, and head. *See* R. at 150-51. Plaintiff is currently thirty-seven years of age. *See* R. at 33.

8.      In his 1994 accident, Kahrs suffered a closed head injury and exhibited impaired cognitive functions. *See* R. at 152. On June 10, 1994, he was discharged from the hospital with the following final diagnosis: rehabilitation status post multiple trauma with late effects of a traumatic brain injury. *See* R. at 152. The medical director, Meenakshi Nayak, M.D., stated that Mr. Kahrs "was alert and cooperative and oriented. Cognitive functions were impaired." *Id.* The patient, at the time of discharge, "was independent in dressing, grooming, feeding, toileting and showering. Evaluation of living skills showed that he did well in areas of telephone usage, money management, usage of emergency numbers and community outings. He experienced good safety awareness and light homemaking tasks. Extremity strength was normal. It was recommended that he be referred to Division of Vocational Rehabilitation. Speech cognitive

evaluation revealed that he had primary problems of decreased thought organization and decreased synthesis of information and impaired memory. He was started in a program to remediate these deficits. Improvement was noted but continued therapy was recommended after discharge." *See* R. at 153-54.

9.     Some short time after the claimant's accident in 1994, he was admitted to the vocational rehabilitation center. *See* R. at 194. Early on during his rehabilitation, Dr. Nayak diagnosed Mr. Kahrs with multiple traumas and concluded "functional improvement is good although cognitive impairment appears to be pretty severe and may take a long time for remediation." *See* R. at 195. A few weeks later Steven Cob, Ph.D. evaluated Mr. Kahrs for a psychological evaluation. *See* R. at 184. The doctor's diagnostic impression was that Mr. Kahrs suffered from post traumatic brain syndrome and he had borderline intellectual functioning with a global assessment of functioning of 50. *Id.*[2]  He also stated that the claimant's cognitive abilities were improving fairly well in the rehabilitation program. *Id.*

10.     On June 28, 1994, Dr. Nayak stated that the claimant continued to have cognitive impairment but he had shown improvement since the accident. *See* R. at 220. He also stated that Mr. Kahrs needed to continue his cognitive therapy and that he was not capable of working for at least two years. *Id.* Dr. Nayak's impressions in August of 1994 were that the patient still had significant cognitive impairment and needed further cognitive remediation therapy. *See* R. at 219. Dr. Nayak maintained his initial determination that Mr. Kahrs was not able to return to work and

---

[2]     Global Assessment of Functioning (GAF) is a scale which considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. The scale from 50 to 41 indicates "[s]**erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." American Psychiatric Ass.n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. 1994).

that he was still very disabled. *Id.*

11.     The claimant was referred for a complete in-person psychological assessment in January of 1995 by the Disability Determination Services. *See* R. at 221-28. Charles A. Berry, Ph.D. was the examining psychologist. *Id*. Dr. Berry performed multiple tests including GAF and Wechsler Adult Intelligence Scale (WAIS) assessments. *See* R. at 225. Dr. Berry found that Mr. Kahrs was in the range of borderline intellectual functioning with a verbal IQ of 78, a performance IQ of 80 and a full scale IQ of 77, all of which were within the "confidence limits." Mr. Kahrs' GAF was listed at 35.[3] The doctor's diagnostic impression was that Mr. Kahrs sustained mild dementia and psychological stressors from his head injury and his inability to engage in usual employment. *See* R. at 227.

12.     In September of 1995, Mr. Kahrs underwent another psychiatric evaluation with Cheryl Hollingsworth, M.D. *See* R. at 229. Dr. Hollingsworth also completed multiple tests during her evaluation. Specifically, she rated Mr. Kahrs with borderline intellectual functioning with a GAF of 60.[4] *See* R. at 232. Although Dr. Hollingsworth stated that the claimant "is unable to successfully have a job," her mental status examination revealed that "[Mr. Kahrs] had some cognitive impairment in the past but that he has made up for this," "he was a very good parent," and that he should have "[a]ssitance with some type of gainful employment, even on part-time

---

[3]     The scale from 40 to  31 indicates "**[s]ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." American Psychiatric Ass.n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. 1994).

[4]     The scale from 60 to  51 indicates "**[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Ass.n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. 1994).

limited basis." *See* R. at 231-32.

13.     Approximately two years later, in May of 1997, the Division of Vocational Rehabilitation referred Mr. Kahrs to Lynn B. Daugherty, Ph.D. *See* R. at 254. Dr. Daugherty performed a neuropsychological evaluation finding that the "cognitive difficulties [the claimant] experienced shortly after the brain injury have been remedied for the most part. Probably the most significant neuropsychological deficit that Mr. Kahrs exhibits at the present time is a substantial slowness of his functioning. Slight difficulties also exist in the area of short term and complex memory, long term verbal memory, reasoning and abstracting ability, understanding of complex verbal communication, and reduced verbal productivity." *See* R. at 257. She also stated that "[t]he most significant changes between Mr. Kahrs' functioning prior to the motorcycle accident and his current functioning appear to lie in the area of emotional functioning, rather than specific cognitive deficits. Substantial problems with suspiciousness, depression, and anger are present." *Id*. Dr. Daugherty's vocational assessment of Mr. Kahrs described that from "neuropsychological standpoint, slight residual deficits may interfere with his functioning, but his overall slowness appears to be the major change affecting his ability to perform tasks. . . . His personality change due to brain injury is also likely to interfere substantially with interpersonal relationships in a vocational setting." *See* R. at 258. Additionally, the doctor stated that "an attempt to assist Mr. Kahrs in returning to some type of work . . . . would probable be a good way to try to assist him vocationally." *Id*. However, Dr. Daugherty also indicated that because the evaluations indicated that Mr. Kahrs "is no longer capable of performing carpentry work, other vocational areas that emphasize manipulation of materials rather than academic skills could be explored." *See* R. at 272.

14.     In a Progress Summary in July of 1997 from New Mexico Speech and Language

Consultants, a speech-language pathologist stated that Mr. Kahrs made "significant progress" with respect to improving his cognitive skills. *See* R. at 262. Specifically, the pathologist commented on Mr. Kahrs' improved attention and reasoning skills but that he still shows "some mild deficits within reasoning and judgment." *Id.*

15.    Two months later, David Sterling, M.Ed. from New Mexico State Department, Division of Vocational Rehabilitation, reported that Mr. Kahrs has "remediated fairly well as for as cognitive abilities, [but] there are still over all deficits regarding slowness and processing speed." *See* R. at 278. Mr. Sterling concluded that Mr. Kahrs' cognitive slowing, personality changes along with impulse control and anger management "are significant barriers to Mr. Kahrs' employability." *Id*. Mr. Sterling also opined that "Mr. Kahrs should be granted Social Security benefits because of the level of dysfunction that he experiences and his degree of functional limitations." *Id.* Similarly Marla Wittkopf from the New Mexico Rehabilitation Center, stated that employment for Mr. Kahrs was premature due to his difficulty keeping his anger under control. *See* R. at 284.

16.    The following summary represents questions that were asked by the ALJ at Mr. Kahrs' hearing on July 9, 1997. The Plaintiff testified, at that hearing, that he had a brain injury, right shoulder problems, and an amputated leg below the right knee . *See* R. at 303. With respect to his physical abilities, Mr. Kahrs stated that he cannot sit for long periods of time and must stand every half hour. *See* R. at 313. The claimant's ability to stand is limited to approximately an hour to an hour and a half at a time. *Id*. He also stated that he can walk about two and a half blocks before taking a rest. *Id*. Mr. Kahrs also testified that he is currently the sole care giver to his ten-year old daughter. *See* R. at 298. The claimant testified to performing multiple activities including reading the newspaper, putting jigsaw puzzles together, mowing the lawn, doing the laundry, shopping for

8

groceries, preparing meals, and doing house work as well as taking care of a cat and a dog. *See* R. at 308-10.

17.    A vocational expert testified in order to assess Mr. Kahrs' functional capacity. *See* R. at 340. The ALJ asked the VE the following question:

> If you were to consider an individual, hypothetically, an individual the age, educational background and experience of the claimant – if we were to consider that the individual was limited to a light range of work and further limited in that the individual could only do simple, routine, repetitive work with no excessive walking, squatting, or stooping, no crawling or climbing. Given those limitations, would the individual described be able to do any of the past relevant work that you've indicated? *See* R. at 341.

The VE stated that the claimant could perform a number of jobs that would be available in factory work settings including, production line, assembly-type work, fire-work fuse assembler, manufacturing in rubber production, cheese grader, or an ornament maker by hand. *See* R. at 341-44.

### III. DISCUSSION

18.    Plaintiff essentially raises five arguments in support of his Motion to Reverse or Remand the Administrative Agency Decision. First, the Plaintiff argues the ALJ failed to properly evaluate the claimant's disability under the listings; second, the ALJ erred in determining the claimant's residual functional capacity; third, the ALJ's hypothetical question to the VE was not supported by the medical evidence; fourth, the ALJ erred in relying on the opinion of an incompetent VE; and lastly, the ALJ erred in failing to re-open the prior claim as the claimant's significant mental problems prevented him from asserting his appeal rights.

### The Listings

19.    Plaintiff contends that the ALJ's analysis under the Listings is flawed. Specifically, Plaintiff asserts that the ALJ did not properly analyze the Plaintiff's conditions under the Listing for

Organic Mental Disorder. *See* Pl. Brief at 4.

20.     When there is evidence of mental impairment that allegedly prevents a claimant from working, the ALJ must follow the procedure for evaluating mental impairment set forth in the applicable regulation and listing of impairments and document the procedure accordingly. *See* 20 C. F. R. § 404.1520a; *see also* 20 C.F.R. § 404, Subpt P, App. 1, § 12.02; *see also Cruse v. U. S. Dept of Health & Hum. Serv.*, 49 F.3d 614, 616 (10th Cir. 1995). This procedure first requires the ALJ to determine the presence or absence of certain medical findings pertaining to the claimant's ability to work, sometimes referred to as "Part A" criteria. *See* 20 C.F.R. § 404, Subpt P, App. 1, § 12.02A. The ALJ must then evaluate the degree of functional loss resulting from the impairment, using "Part B" criteria. 20 C.F.R. § 404, Subpt P, App. 1, § 12.02B. To record his conclusions, the ALJ then prepares a standard document called a psychiatric review technique form (PRT form) that tracks the listing requirements and evaluates the claimant under Part A and B criteria. *See* 20 C.F.R.§404.1520a(b)(2, 3), (d). At the administrative hearing level, the ALJ may complete the PRT form with or without the assistance of a medical advisor. 20 C. F. R. § 404.1520a(d)(1). However, the standard form must be appended to the decision and the ALJ must discuss in his opinion the evidence he considered in reaching the conclusions recorded. 20 C. F. R. §404.1520a(d)(2); *see also Cruse*, 49 F.3d at 617.

21.     Mr. Kahrs asserts his mental condition met both the "A" and "B" Criteria requirements under Listing § 12.02 (20 C. F. R., Pt. 404, Subpt. P, App. 1, § 12.02). To establish that a claimant has an organic mental disorder, the claimant must demonstrate:  (1) a  loss of specific cognitive abilities (Part A Criteria), and (2) that the loss of those abilities cause a significant impairment to everyday functioning (Part B Criteria). 20 C.F.R., Part 404, Subpart P, Appendix 1,

§ 12.02.

22.     The ALJ determined that Plaintiff has memory impairment, change in personality,

emotional lability and impairment in impulse control thus meeting the listing requirement in the "Part

A" criteria. *See* R. at 17.[5] However, the ALJ determined the claimant was not conclusively disabled

because he did not satisfy the Part B criteria for the listed impairment of an organic mental disorder.

*See* R. at 25. To meet the listing requirements under the "Part B" criteria regarding the severity of

the impairment, the condition or impairment must result in at <u>least two</u> of the following: (1) marked

restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3)

frequent deficiencies of concentration, persistence or pace resulting in frequent failure to complete

tasks in a timely manner (in work settings or elsewhere); or (4)  repeated episodes of deterioration

or decompensation in work or work-like settings which cause the individual to withdraw from that

situation (decompensation) or to experience exacerbation of signs and symptoms (which may include

deterioration of adaptive behaviors). 20 C.F.R. § 404.1520a(b)(3); 20 C.F.R. Pt. 404, Subpt. P, App.

1, § 12.04 B. A "marked" limitation is one in which the degree of limitation is such as to seriously

interfere with the ability to function independently, appropriately and effectively. *See Cruse*, 49 F.3d

at 618.

23.     Plaintiff asserts that substantial evidence does not support the ALJ's finding that

Mr. Kahrs did not demonstrate significant impairment to everyday functioning. Specifically, the

Plaintiff argues that the reports of  medical experts satisfy the requisite criteria for an organic mental

disorder and that the ALJ failed to distinguish them. The Plaintiff particularly points to the findings

of Dr. Berry, Dr. Dougherty, Ms. Wittkopf and Mr. Sterling.  The ALJ made the following

---

[5]     These findings were completed and appended in a PTR form to the ALJ's decision. *See* R. at 23.

conclusions under the Part B criteria: Mr. Kahrs had only "moderate" restrictions on his activities of daily living; "moderate" difficulties in maintaining social functioning; "often" had deficiencies of concentration, persistence or pace; and "never" had episodes of deterioration or decompensation. *See* R. at 28-29.

24.     In reaching my recommended finding,  I will analyze each of the four Part B criteria requirements in turn. First, the ALJ found Mr. Kahrs had only "moderate" restrictions on his activities of daily living. *See* R. at 28. I find that this conclusion is supported by substantial evidence. Activities of daily living include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using telephones and directories, using a post office, etc. In the context of the individual's overall situation, the quality of these activities is judged by their independence, appropriateness, and effectiveness." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.00(C)(1). Not only does the Plaintiff take care of his own needs, he is the sole care taker of his ten-year old daughter. *See* R. at 266 and 298. He testified that he performs multiple activities including reading the newspaper, putting jigsaw puzzles together, mowing the lawn, doing the laundry, shopping for groceries, preparing meals, and doing house work as well as taking care of a cat and a dog. *See* R. at 308-10. Mr. Kahrs also testified that he rides his bike for transportation. *See* R. at 305. This evidence supports the ALJ's findings that the Plaintiff is, at most, moderately limited in his daily activities.

25.     Next, the ALJ found Mr. Kahrs had only "moderate" difficulties in maintaining social functioning. *See* R. at 28-29. According to the regulations

> [s]ocial functioning refers to your capacity to interact independently, appropriately,
> effectively, and on a sustained basis with other individuals. Social functioning includes
> the ability to get along with others, such as  family members, friends, neighbors,
> grocery clerks, landlords, or bus drivers. You may demonstrate impaired social

functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers. 20 C.F.R. Part 404, Subpt. P, App. 1, §12.00(C)(2).

26.     In support of the Plaintiff's argument, he points to various statements made by multiple evaluators including Dr. Berry's analysis of Mr. Kahrs' I.Q., Dr. Daugherty's psychological evaluation, and Marla Wittkopf's and David Sterling's opinions. With respect to Mr. Kahrs' <u>social functioning</u>, the only pertinent evaluation is Dr. Daugherty's. Dr. Berry's analysis of Mr. Kahrs' I.Q. is irrelevant since the social functioning regulations do not take into account one's intellectual abilities.[6] Ms. Wittkopf's and Mr. Sterling's evaluations are also not acceptable. The determination of whether a plaintiff's ailments satisfy the criteria of a listed impairment must be based solely on medical evidence. *See* 20 C.F.R. §§ 404.1526(b), 416.926(b) ("[a] medical consultant must be a physician. A psychological consultant used in cases where there is evidence of a mental impairment must be a qualified psychologist. (See § 404.1616 for limitations on what medical consultants who are not physicians can evaluate and the qualifications we consider necessary for a psychologist to be a consultant.)"). There is nothing in the record to indicate that either Mr. Sterling or Ms. Wittkopf meets any these requirements. *See* R. at 278 and 279).

27.     The record states that Dr. Daugherty made multiple findings over a two month period.

---

[6]     Although Dr. Berry's evaluation is irrelevant with respect to the social functioning prong of the Part B criteria, it is extremely relevant with respect to the concentration, persistence or pace prong and will be discussed in that section of the opinion.

In March of 1997, she stated that Mr. Kahrs exhibits "substantial problems with suspiciousness, depression, and anger." *See* R. at 258. Her vocational assessment was that from a "neuropsychological standpoint, slight residual deficits may interfere with [the Plaintiff's] functioning, but his overall slowness appears to be the major change affecting his ability to perform tasks. . . . His personality change due to brain injury is also likely to interfere substantially with interpersonal relationships in a vocational setting." *Id*. Additionally, the doctor stated that "an attempt to assist Mr. Kahrs in returning to some type of work . . . would probable be a good way to try to assist him vocationally." *Id*. However, two months later, Dr. Daugherty reported that "Mr. Kahrs' attitude was friendly and polite. He spoke readily with the evaluator in an apparently open and honest manner and appeared relaxed concerning the evaluation. He [sic] speech was clear but moderately slow and deliberate, although no obvious work finding difficulties were noted. His understanding of questions appeared to be appropriate. His vocabulary and grammar were good." *See* R. at 267. In addition, there are multiple situations recorded within the record where Mr. Kahrs' treating physicians comment on his "friendly and cooperative" manner. *See* R. at 183; *see also* R. at 194, 224. It has also been noted that as a part of the claimant's daily activities he meets with his brother-in-law for coffee and sometimes takes walks with his daughter, watches her play, and helps her with her homework. *See* R. at 230 and 266.

28.     According to guidance appropriated by the regulations, "'[m]arked' is not the number of areas in which social functioning is impaired, but by the nature and overall degree of interference with function." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.00(C)(2). The regulations also state that a claimant "may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. [The

claimant] may exhibit strength in social functioning by such things as [his] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." *Id*. In this case, there is sufficient evidence in the record to support the ALJ's finding that the claimant had only "moderate" difficulties in maintaining social functioning. There is no evidence in the record demonstrating the characteristics of "impaired social functioning" as set forth in the regulations. If anything, there is evidence to the contrary, e.g., the Plaintiff's cooperative nature towards his doctors and his social contact with his family. With respect to Dr. Daugherty's opinion, as stated above, the ALJ may reject the treating physician's opinion if it is not well supported by clinical and/or laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Castellano v. Secretary of Health and Human Servs.,* 26 F.3d 1027, 1027 (10th Cir.1994). Therefore, I find that the ALJ's determination regarding the Plaintiff's social functioning is supported by substantial evidence.

29.    Next, the ALJ found Mr. Kahrs "often" had deficiencies of concentration, persistence or pace. *See* R. at 28-29. According to the regulations

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. . . .  In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits. In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective. 20 C.F.R. Part 404, Subpt. P, App. 1, §12.00(C)(3).

In essence, the Plaintiff argues that Dr. Berry's report in January of 1995, reporting that Mr. Kahrs'

I.Q. dropped from an estimated pre-morbid 93 to a post injury 77 and he had a GAF of 35, constitutes a finding of "frequent" on the deficiencies of concentration, persistence or pace requirement. However, other findings in the record indicate that Mr. Kahrs' I.Q. and GAF, and general cognitive functions improved over the years. In September, 1995, Dr. Hollingsworth assessed Mr. Kahrs' GAF at 60 and stated that his long-term memory was excellent, his insight was good, and he has had some cognitive impairment in the past but has made up for it. *See* R. at 231. Although she rates him with borderline intellectual functioning, she adds that Mr. Kahrs is "persistent," "wants to be gainfully employed," and "is a very good parent." *Id*. In addition, in May of 1997, Dr. Daugherty assessed Mr. Kahrs' full scale I.Q. at 82. *See* R. at 268. Dr. Daugherty also stated that "[Mr. Kahrs'] memory for both recent and remote events appeared intact . . . [h]is intellectual functioning was estimated to be in the average range. . . [h]is judgment in daily situations and major life decisions appeared thoughtful and his understanding of his situation appeared fair." *Id*.

30.     This evidence supports the ALJ's finding regarding Mr. Kahrs' deficiencies of concentration, persistence or pace. The evidence supports the finding that the Plaintiff has not deteriorated or decompensated in a work setting. If anything, the evidence supports a contrary conclusion. Therefore, I recommend find the ALJ's determination that the Plaintiff was not disabled under the Listings is supported by substantial evidence.[7]

<u>Residual Functional Capacity</u>

31.     Plaintiff next argues that the ALJ erred in assessing his residual functional

---

[7]      Because the Plaintiff's disorder does not meet any of these three requirements, it is immaterial whether or not he would have met the fourth requirement. To meet the listing requirements under the "Part B" criteria regarding the severity of the impairment, the condition or impairment must result in at <u>least two</u> of the four requirements. 20 C.F.R. § 404.1520a(b)(3); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04 B.

capacity (RFC). Specifically, the Plaintiff asserts that the ALJ improperly relied on non-examining, non-treating DDS physicians and that he did not take into account the Plaintiff's standing/walking limitations. The Defendant asserts that the ALJ correctly relied on the vocational expert who listed specific examples of job availabilities as well as evidence bearing on Plaintiff's ability to do daily activities. At step four, the ALJ determined that the Plaintiff was not disabled and that he had retained the residual functional capacity to perform at least light work. *See* R. at 26. The ALJ relied not only on the vocational expert's opinion at the hearing, but also two social security medical consultants who stated that the claimant can perform the full range of light work. *See* R. at 48 and 92. The ALJ also stated in support of his RFC assessment that "the claimant walks and exercises on a daily basis. . . . Though the claimant has a severe mental impairment, he has the ability to understand, carry out and remember simple instructions; use judgment; respond appropriately to supervision, coworkers and usual work situations; and deal with changes in a routine work setting." *See* R. at 19.

32.     Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, requires a good deal of walking, standing, or pushing and pulling when sitting is involved. SSR 83-10; 20 C. F. R. § 404.1567( b), 416.967(a) (1986). Thus, the ability to lift twenty pounds is an occasional rather than frequent requirement, and is consistent with the medical findings. The full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. *Id.*

33.     The Plaintiff argues that the ALJ failed to support his RFC conclusion with substantial evidence. Particularly, the Plaintiff points to a consultative exam performed by Dr. Lenore Herrera in October of 1995. The doctor's conclusions stated that "[l]ifting and carrying to some

extent will be limited on a repetitive basis and from the ground level due to his right leg amputation."
*See* R. at 235. She also placed limitations on the Plaintiff's walking capabilities but no limitations on
his sitting capabilities. *Id*.

34.     It seems the Plaintiff is grounding his argument, that he cannot perform light
work, on the fact that his right leg below the knee is amputated. This argument is not persuasive.
Plaintiff's leg was amputated in a 1984 motorcycle accident. *See* R. at 130. However, Mr. Kahrs was
employed as a cabinet maker up until his second motorcycle accident in 1994. *See* R. at 300-01.
There is no medical evidence, besides the Plaintiff's testimony, indicating that his leg condition had
deteriorated as a result of this accident. In addition, the ALJ's question to the VE accommodated the
claimant's current condition. That question stated the VE should further limit the jobs to an individual
that "could only do simple, routine, repetitive work with no excessive walking, squatting, or stooping,
no crawling or climbing." *See* R. at 341. The VE concluded that the claimant could perform several
different kinds of jobs including a fruit picker, which was a job that he had previously performed after
his 1984 accident. *See* R. at 230. In addition, the Plaintiff's daily activities exemplify a person who
is capable of at least light work. For example, the Plaintiff testified to being the sole care provider of
his daughter, performing multiple activities including reading the newspaper, putting jigsaw puzzles
together, mowing the lawn, doing the laundry, shopping for groceries, preparing meals, and doing
house work as well as taking care of a cat and a dog. *See* R. at 308-10. Therefore, I recommend
finding that the ALJ's RFC determination is supported by substantial evidence.

<u>Hypothetical Question</u>

35.     Plaintiff argues in his brief that the ALJ's hypothetical questions were unsupported
by the medical record and did not accurately reflect his mental impairment. Hypothetical questions

posed to a vocational expert may only reflect impairments and limitations supported by the record as found by the ALJ. *See Decker v. Chater*, 86 F. 3d 953, 955 (10th Cir. 1996). The ALJ asked the VE to assume an individual who is further limited in that the individual could only do simple, routine, repetitive work. *See* R. at 341. He then asked the VE to evaluate the Plaintiff's functional capacity in light of the VE's aptitude assessment. *See* R. at 344. The VE responded that in view of the Plaintiff's aptitude, there would be no effect on the jobs available. *Id*. The VE also stated that the jobs she listed were all jobs not requiring social or verbal interaction with others but merely performance positions. *See* R. at 349. The VE addressed this issue based on the ALJ's questions pertaining to the Plaintiff's memory loss, *see* R. at 342, as well as testimony given by the Plaintiff's expert witness concerning the Kahrs' cognitive problems. *See* R. at 348. The ALJ posed hypothetical questions to the VE that adequately reflected the nature and severity of Plaintiff's impairments as borne out by substantial evidence in the record. Therefore, the ALJ's hypothetical questions were proper and the VE's opinion that a substantial number of jobs existed in the national economy which Plaintiff could perform is supported by substantial evidence.

<u>Vocational Expert</u>

36.    The Plaintiff's next argument asserts that the ALJ erred in relying on the testimony of an incompetent vocational expert. Specifically, the Plaintiff argues that the VE was incompetent for suggesting that the Plaintiff could return to past relevant work in manufacturing rubber or picking fruit. The argument concerning the vocational expert's competency is without any foundation. The Plaintiff's argument is completely void of any legal or factual support. Therefore, because the Plaintiff fails to point to relevant facts within the record pertaining to the vocational expert's incompetency, I find that this claim is without merit. Just saying it doesn't make it so.

19

<u>Res Judicata</u>

37.     The Plaintiff's remaining argument is one based on the principle of res judicata.

Kahrs claims that the ALJ erred in failing to reopen his prior claim because the Plaintiff's mental

impairment prevented him from asserting his appeal rights. In June of 1994, the Plaintiff applied for

Social Security disability benefits and was denied in January, 1995. *See* R. at 33-36 and 59. He did

not file an appeal. In the Commissioner's 1997 decision, the decision currently on review, the ALJ

stated that the claimant failed to meet his burden of proof to show timeliness and good cause for

reopening. *See* R. at 14. The Plaintiff now argues this issue before to this Court.

38.     Generally, federal courts do not have jurisdiction to review refusals by the

Secretary to reopen claims for disability benefits. *See Califano v. Sanders*, 430 U. S. 99, 107 09

(1977); *see also Brown v. Sullivan*, 912 F. 2d 1194, 1196 (10th Cir. 1990) (*per curiam*). In *Sanders*,

the Supreme Court noted that federal courts' jurisdiction under the Social Security Act is limited to

review of a "final decision of the Secretary made after a hearing." *Sanders*, 430 U. S. at 108. "Since

the advent of *Sanders*, the courts have held that, absent a colorable constitutional claim, federal

courts are without jurisdiction to review the Secretary's denial of benefits on the basis of res

judicata." *Parker v. Califano*, 644 F. 2d 1199, 1201 (6th Cir. 1981)(citations omitted). In considering

what constitutes a "colorable constitutional claim," courts have held that the constitutional issue must

have "some merit," and not be "wholly insubstantial or frivolous." *Koerpel v. Heckler,* 797 F.2d 858,

863 (10th Cir.1986) (quoting *Boettcher v. Secretary of Health and Human Servs.,* 759 F.2d 719, 722

(9th Cir.1985)).

39.     In *Elchediak v. Heckler*, 750 F.2d 892 (11th Cir.1985),  a claimant for disability

benefits alleged that his mental illness prevented him from proceeding in a timely fashion from one

administrative level to the next. The Eleventh Circuit Court held that the claimant's application was not barred by administrative res judicata, reasoning that "the very disability that forms all or part of the basis for which the claimant seeks benefits may deprive him of the ability to understand or act upon notice of available administrative procedures." *Id.* at 894 (quoting *Parker v. Califano,* 644 F.2d 1199, 1203 (6th Cir.1981)). The alleged due process deficiency, according to the court, "was not the content of the notices mailed and received, but rather, the claimant's ability to understand and act on that notice." *Id.* In concluding that the plaintiff had stated a colorable constitutional claim, the court found the following factors dispositive: (1) the claimant suffers from a medically-documented mental illness that forms the basis of his disability claim; (2) he was unrepresented by counsel on his prior application; and (3) he cannot assert a new claim for benefits because he now lacks insured status. *Id.* 750 F.2d at 895.

40.     Many other jurisdictions, besides the Eleventh Circuit, have recognized that a claimant's substantiated allegation of a mental impairment that precludes him from pursuing his administrative remedies constitutes a colorable constitutional claim sufficient to invoke federal court jurisdiction. *See, e.g., Penner v. Schweiker,* 701 F.2d 256, 260-61 (3d Cir.1983); *Parker v. Califano,* 644 F.2d 1199, 1203 (6th Cir.1981); *Shrader v. Harris,* 631 F.2d 297, 301-02 (4th Cir.1980); *Brittingham v. Schweiker,* 558 F.Supp. 60, 61 (E.D.Penn.1983). Although the Tenth Circuit has never directly addressed this issue, several lower courts in the Tenth Circuit have likewise adopted the above rule. *See, e.g., Popp v. Secretary of Health and Human Servs.,* No. 85-6099, 1988 WL 147419 (D.Kan. filed Sept. 26, 1988); *Voth v. Bowen,* 702 F.Supp. 271 (D.Kan.1988).[8]

---

[8]     The Tenth Circuit has ruled only that a claimant's unsupported allegation of mental impairment is insufficient to create a colorable constitutional claim. *Nelson v. Secretary of Health and Human Servs.,* 927 F.2d 1109, 1111 (10th Cir.1990).

41.     In the present case, the Plaintiff presented his due process claim to the ALJ, alleging that his mental impairment precluded him from complying with the administrative procedures. *See* R. at 14. Although the Plaintiff alleges that he suffers from a medically documented mental disability, he does not allege that he was unrepresented by counsel during his previous application. Therefore, I recommend finding that the Plaintiff has failed to state a colorable due process claim, and the application of administrative res judicata to his claim was properly made.

### RECOMMENDED DISPOSITION

The ALJ did apply correct legal standards and his decision is supported by substantial evidence. I recommend that the Plaintiff's Motion to Reverse and Remand Administrative Decision, filed February 26, 2001, should be **DENIED**. Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to §636(b)(1)(C), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**